(Slip Opinion) OCTOBER TERM, 2024 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FULD ET AL. *v.* PALESTINE LIBERATION ORGANIZATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 24–20. Argued April 1, 2025—Decided June 20, 2025*

Before the Court are two separate lawsuits filed in the United States District Court for the Southern District of New York under the Antiterrorism Act of 1990 (ATA). The ATA creates a federal civil damages action for U. S. nationals injured or killed "by reason of an act of international terrorism." 18 U. S. C. §2333(a); see also §2333(d)(2) (permitting aiding and abetting liability). Respondents (defendants below) are the Palestine Liberation Organization (PLO) and Palestinian Authority (PA)—entities responsible for carrying out governmental functions for parts of the West Bank and Gaza Strip.

The question presented is whether the exercise of personal jurisdiction over respondents under the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA) violates the Due Process Clause of the Fifth Amendment. The PSJVTA names the PA and PLO specifically and provides that they "shall be deemed to have consented to personal jurisdiction" in ATA cases under two circumstances. §§2334(e)(1), (5). The first jurisdictional predicate relates to respondents' practice of paying salaries to terrorists in Israeli prisons and to families of deceased terrorists—conduct Congress has condemned as "an incentive to commit acts of terror." 132 Stat. 1143. The second ties jurisdiction to respondents' activities on U. S. soil. §2334(e)(1)(B).

Petitioners alleged that respondents engaged in conduct triggering both jurisdictional predicates. The Second Circuit held that the

————————

*Together with *Waldman et al.* v. *Palestine Liberation Organization et al.* (see this Court's Rule 12.4) and No. 24–151, *United States* v. *Palestine Liberation Organization et al.*, also on certiorari to the same court.

PSJVTA could not, consistent with constitutional due process, establish personal jurisdiction over the PLO or PA.

*Held*: The PSJVTA's personal jurisdiction provision does not violate the Fifth Amendment's Due Process Clause because the statute reasonably ties the assertion of jurisdiction over the PLO and PA to conduct involving the United States and implicating sensitive foreign policy matters within the prerogative of the political branches. Pp. 7–21.

  (a) Courts must have personal jurisdiction over parties before resolving cases. *Lightfoot* v. *Cendant Mortgage Corp.*, 580 U. S. 82, 95. The Court's modern personal jurisdiction cases have addressed the limitations imposed by the Fourteenth Amendment on the jurisdiction of state courts, but the Court has reserved whether the Fifth Amendment imposes the same restrictions on federal courts. Pp. 7–14.

    (1) The Fourteenth Amendment personal jurisdiction framework derives from *International Shoe Co.* v. *Washington*, 326 U. S. 310, and requires that a defendant have sufficient "contacts" with the forum State so that maintaining suit is "reasonable" and "does not offend traditional notions of fair play and substantial justice." *Ford Motor Co.* v. *Montana Eighth Judicial Dist. Court*, 592 U. S. 351, 358 (quoting *International Shoe*). Respondents urge application of this familiar framework here, noting that the Due Process Clauses of the Fifth and Fourteenth Amendments are textually similar. The Court has recognized, however, that the Amendments "were engrafted upon the Constitution at different times and in widely different circumstances" and thus that "questions may arise in which different constructions and applications of their provisions may be proper." *French* v. *Barber Asphalt Paving Co.*, 181 U. S. 324, 328. Pp. 8–9.

    (2) The Fourteenth Amendment's due process limitations are driven by two principles: (1) treating defendants fairly and (2) protecting interstate federalism, the latter of which ensures "that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 292. These interstate federalism concerns do not apply to the Fifth Amendment's limitations on the power of the Federal Government and the corollary authority of the federal courts. The Constitution empowers the Federal Government—and it alone—with both nationwide and extraterritorial authority. Because the State and Federal Governments occupy dramatically different sovereign spheres, the Court declines to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment. Rather, the Fifth Amendment permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority. Pp. 9–12.

    (3) While acknowledging that interstate federalism concerns are

irrelevant under the Fifth Amendment, respondents argue that fairness and individual liberty considerations justify applying equivalent jurisdictional limitations. But the Court has observed in the Fourteenth Amendment context that interstate federalism concerns may be decisive. See *World-Wide Volkswagen Corp.*, 444 U. S., at 294. Accordingly, while these "general fairness considerations" are relevant to the Fourteenth Amendment inquiry, they do not compel applying equivalent jurisdictional limits here. Pp. 13–14.

(b) The Court does not delineate the full scope of the Federal Government's power to hale foreign defendants into U. S. courts. Whatever the Fifth Amendment's outer limits, the PSJVTA—which ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns—does not transgress them. Pp. 14–21.

(1) The Federal Government's foreign affairs power must be exercised within constitutional bounds. See *American Ins. Assn.* v *Garamendi*, 539 U. S. 396, 416–417, n. 9. The Court accordingly reviews even legislation implicating foreign policy issues to ensure that it has not crossed a constitutional line. See *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 34. Here, in passing and signing the PSJVTA into law, Congress and the President made a considered judgment to subject the PLO and PA to liability in U. S. courts as part of a comprehensive legal response to deterring international terrorism that threatens the life and limb of American citizens. The PSJVTA reflects the political branches' balanced judgment of competing concerns over national security, foreign affairs, and fairness to these defendants—entities with which the Federal Government has complex, longstanding relationships in which concerns over terrorism have been paramount.

The PSJVTA is suitably limited to these ends. It does not broadly expose respondents to myriad civil actions, but applies only to ATA cases. The Federal Government may craft a narrow jurisdictional provision ensuring Americans injured or killed by acts of terror have an adequate forum in which to vindicate their right to ATA compensation.

The statute's jurisdictional predicates are likewise narrow. The payments prong furthers the Federal Government's longstanding policy of deterring payments that promote acts of overseas terror that may potentially injure or kill Americans. The activities prong, in predicating jurisdiction on respondents' U. S. conduct, is a continuation of the Federal Government's longstanding, nuanced policy governing the operations that respondents may conduct on U. S. soil. The PSJVTA thus ties jurisdiction to specific, narrow conduct directly implicating sensitive and ongoing concerns in respondents' relationships with the United States. And the statute's targeted applicability to only two enumerated nonsovereign foreign entities put the PLO and PA on full

notice that they could be subject to personal jurisdiction in ATA suits in U. S. courts.  18 U. S. C. §§2334(e)(1), (5).  Pp. 14–19.

(2) Because the Court holds that the PSJVTA ties jurisdiction to predicate conduct bearing a meaningful relationship to the United States, the Court need not consider whether the statute comports with cases addressing when defendants may be deemed to have consented to jurisdiction.  See, *e.g.*, *Mallory* v. *Norfolk Southern R. Co.*, 600 U. S. 122.  P. 19.

(c) Although the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard, the Fifth Amendment might still require a "reasonableness" inquiry.  *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102, 115. Even assuming such analysis is constitutionally required, the PSJVTA easily satisfies the factors previously applied to determine "the reasonableness of the exercise of jurisdiction" under the Fourteenth Amendment.  *Id.*, at 113.  Reasonableness depends on evaluating "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief."  *Ibid.*  The PSJVTA satisfies all three.  The Federal Government has an exceedingly compelling interest in providing a forum for American victims to hold accountable the perpetrators of acts of international terror that harm U. S. citizens.  American plaintiffs have a strong interest in seeking justice through ATA damages actions in U. S. courts.  Finally, respondents do not assert lack of notice or contend that litigating in the United States forces them to bear an unfair or unmanageable burden.  Accordingly, it cannot be said that the PSJVTA's jurisdictional rule makes litigation so "gravely difficult and inconvenient," *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 478, as to render the exercise of personal jurisdiction "unreasonable and unfair," *Asahi*, 480 U. S., at 116.  Pp. 19–21.

82 F. 4th 64 (second judgment) and 74 (first judgment), reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which ALITO, SOTOMAYOR, KAGAN, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment, which GORSUCH, J., joined as to Part II.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 24–20 and 24–151

---

MIRIAM FULD, ET AL., PETITIONERS
24–20                    *v.*
PALESTINE LIBERATION ORGANIZATION, ET AL.

EVA WALDMAN, ET AL., PETITIONERS
*v.*
PALESTINE LIBERATION ORGANIZATION, ET AL.

UNITED STATES, PETITIONER
24–151                    *v.*
PALESTINE LIBERATION ORGANIZATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 20, 2025]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Congress passed the Promoting Security and Justice for Victims of Terrorism Act in 2019. The Act deems the Palestine Liberation Organization and the Palestinian Authority—if they engage in specified conduct—to have consented to personal jurisdiction in civil suits brought in the United States under the Antiterrorism Act. The question presented is whether this personal jurisdiction provision violates the Due Process Clause of the Fifth Amendment.

## I

## A

Before us are two separate lawsuits against respondents, the Palestine Liberation Organization (PLO) and Palestinian Authority (PA)—entities responsible for carrying out, respectively, foreign and domestic governmental functions for parts of the West Bank and Gaza Strip. See 82 F. 4th 74, 80 (CA2 2023). Although the United States does not recognize respondents as sovereign, other nations do, and respondents maintain consular facilities and diplomatic missions around the world. The PLO also maintains an office in New York City as part of its mission to the United Nations, in which the PLO participates as a "Permanent Observer." *Ibid.*

Motivated by concerns over respondents' support for overseas terrorism, Congress has for decades restricted their activities on U. S. soil. For example, in the Anti-Terrorism Act of 1987, 101 Stat. 1406, 22 U. S. C. §5201 *et seq.*, Congress found that the PLO and its constituent groups "ha[d] taken credit for, and been implicated in, the murders of dozens of American citizens abroad." §5201(a)(4). Congress accordingly limited the PLO's operations in the United States. §§5201(b), 5202. Congress has similarly restricted the PA's ability to conduct activities on U. S. soil. See Palestinian Anti-Terrorism Act of 2006, §7, 120 Stat. 3324, 22 U. S. C. §2378b. It has also placed limits on the distribution of foreign aid and other assistance to respondents. See Taylor Force Act, §1004(a), 132 Stat. 1144, 22 U. S. C. §2378c–1(a).

As part of its comprehensive legal response to international terrorism, Congress also enacted the Antiterrorism Act of 1990 (ATA), §132, 104 Stat. 2250–2252, 18 U. S. C. §2331 *et seq.*; see H. R. Rep. No. 102–1040, p. 5 (1992). The ATA creates a civil treble damages cause of action for any U. S. national injured or killed "by reason of an act of inter-

national terrorism." §2333(a); see also §2333(d)(2) (permitting aiding and abetting liability). The ATA provides for nationwide service of process and venue and exclusive jurisdiction in federal courts. §§2334(a), 2338.

## B

The ATA supplied the underlying cause of action in both lawsuits now before us. The first was brought by a group of American citizens (and their estates and survivors) injured in terror attacks in Israel. It was filed in 2004 in the United States District Court for the Southern District of New York. See *Sokolow* v. *Palestine Liberation Org.*, No. 1:04–cv–397, 1 App. 1–51.[1] The case went to trial, and in 2015 a jury found respondents liable under the ATA. The jury awarded the plaintiffs $218.5 million in damages, which was trebled to $655.5 million.

That victory was short lived. The next year, the Second Circuit vacated the District Court's judgment and directed dismissal for lack of personal jurisdiction. Respondents were not subject to jurisdiction, the Court of Appeals held, because the complained of "killings and related acts of terrorism . . . were unconnected to the forum and were not expressly aimed at the United States." 835 F. 3d 317, 337 (2016); accord, *Livnat* v. *Palestinian Auth.*, 851 F. 3d 45, 57–58 (CADC 2017).

Congress responded by enacting the Anti-Terrorism Clarification Act of 2018 (ATCA), 132 Stat. 3183. The ATCA added a new provision to the ATA, which deemed defendants "to have consented to personal jurisdiction" if they engaged in certain activities in the United States or accepted particular forms of U. S. foreign assistance. See §4(a), *id.*,

---

[1] This case was recaptioned *Waldman* v. *Palestine Liberation Organization* in the Second Circuit. 82 F. 4th 64, 69, n. 2 (2023) (*per curiam*). Like the parties, we refer to the case as *Sokolow*, which is how it was captioned in the District Court. See Brief for Petitioner Miriam Fuld et al. 9–11; Brief for United States 2, n. 2; Brief for Respondents 5–9.

at 3184.  The *Sokolow* plaintiffs moved for the Second Circuit to recall its mandate in light of the ATCA.  The Court of Appeals declined to do so, 925 F. 3d 570, 574–576 (2019), and the plaintiffs filed a petition for a writ of certiorari in this Court, see Pet. for Cert. in *Sokolow* v. *Palestine Liberation Org.*, O. T. 2019, No. 19–764.

C

While the *Sokolow* certiorari petition was pending, the landscape changed again—this time, through Congress's enactment in December 2019 of the law at issue here: the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), §903, 133 Stat. 3082–3085, 18 U. S. C. §§2333, 2334.  Section 903(c) of the PSJVTA, subtitled "Jurisdictional Amendments to Facilitate Resolution of Terrorism-Related Claims of Nationals of the United States," superseded the ATCA's jurisdictional provisions.  133 Stat. 3083.  Under the PSJVTA's now operative provision, which refers to the PA and PLO by name, respondents "shall be deemed to have consented to personal jurisdiction" in ATA cases in two specified circumstances.  §§2334(e)(1), (5).

The first jurisdictional predicate relates to respondents' practice "of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists"—conduct which Congress has condemned as "an incentive to commit acts of terror."  Taylor Force Act, §1002(1), 132 Stat. 1143.  Jurisdiction is triggered under this prong if, after a specified time, respondents "mak[e] any payment, directly or indirectly":

> "(i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or
>
> "(ii) to any family member of any individual, following such individual's death while committing an act of

terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual." §2334(e)(1)(A).

The PSJVTA's second predicate ties jurisdiction to respondents' activities on U. S. soil. The PLO and PA are deemed to have consented to personal jurisdiction if, after a specified period, either "continues to maintain," "establishes[,] or procures any office, headquarters, premises, or other facilities or establishments in the United States," or otherwise "conducts any activity while physically present in the United States." §2334(e)(1)(B). The statute expressly excludes respondents' United Nations mission and its ancillary activities. §2334(e)(3).

D

Given this legislative development, we granted the *Sokolow* plaintiffs' pending certiorari petition, vacated the judgment of the Second Circuit, and remanded for "further consideration in light of the [PSJVTA]." 590 U. S. \_\_\_ (2020). A few days after our remand, a different set of plaintiffs—the family of an American citizen stabbed in a 2018 attack in the West Bank—sued respondents under the ATA in the Southern District of New York, and invoked the PSJVTA as the basis for personal jurisdiction. See *Fuld* v. *Palestine Liberation Org.*, No. 1:20–cv–3374, 2 App. 383–439.

Both sets of plaintiffs—the *Sokolow* plaintiffs back in District Court and the *Fuld* plaintiffs there for the first time—alleged that respondents had engaged in conduct sufficient to trigger both PSJVTA predicates. In response, respondents contended that the PSJVTA violates the Due Process Clause of the Fifth Amendment. The United States intervened in both cases to defend the law's constitutionality. See 28 U. S. C. §2403(a); Fed. Rule Civ. Proc. 5.1(c).

Both District Courts found evidence that respondents

had engaged in conduct sufficient to satisfy at least the payments prong. *Sokolow* v. *Palestine Liberation Org.*, 607 F. Supp. 3d 323, 325 (SDNY 2022); 578 F. Supp. 3d 577, 583, and n. 3 (SDNY 2022). But both courts agreed with respondents that "an exercise of jurisdiction under either of the PSJVTA's factual predicates is unconstitutional." 607 F. Supp. 3d, at 326; see also 578 F. Supp. 3d, at 595–596.

The Second Circuit consolidated the cases and affirmed. Following Circuit precedent "holding that the due process analyses under the Fifth and Fourteenth Amendments parallel one another in civil cases," the panel explained that the statute's factual predicates involve conduct insufficient to establish personal jurisdiction. 82 F. 4th, at 91, 102. And so, it reasoned, "those same activities" could not "reasonably be interpreted" under the deemed consent language as signaling respondents' intent to submit to "the authority of" U. S. courts. *Id.*, at 91; see also *id.*, at 102–104. The court therefore held that the PSJVTA could not, consistent with "the requirements of constitutional due process," "establish personal jurisdiction over the PLO or the PA." *Id.*, at 80; 82 F. 4th 64, 73 (2023) (*per curiam*).

The Second Circuit denied rehearing en banc. Judge Menashi, joined by two other judges in full and one judge in part, dissented. In his view, the panel had construed too narrowly the circumstances under which a foreign entity may be deemed to have consented to personal jurisdiction. See 101 F. 4th 190, 204–205 (2024). The dissent also disagreed that "the Due Process Clause of the Fifth Amendment imposes the same limits on the jurisdiction of the federal courts that the Due Process Clause of the Fourteenth Amendment imposes on the jurisdiction of the state courts." *Id.*, at 205. In the dissent's view, "the federal government is not similarly situated to the state governments in the extraterritorial reach of its courts," and so "the due process standards limiting the exercise of personal jurisdiction are not the same." *Ibid.*

We granted certiorari to decide whether the PSJVTA violates the Fifth Amendment. 604 U. S. \_\_\_ (2024).

## II

We have long held that a "court must have . . . power over the parties before it (personal jurisdiction) before it can resolve a case." *Lightfoot* v. *Cendant Mortgage Corp.*, 580 U. S. 82, 95 (2017). This requirement, we have stated, "flows . . . from the Due Process Clause." *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 702 (1982). Our modern personal jurisdiction cases, however, have grappled only with the limitations imposed by the *Fourteenth* Amendment on *state* courts. See 4 C. Wright, A. Miller, & A. Steinman, Federal Practice and Procedure §1068.1, pp. 696–699 (4th ed. 2015). We have expressly reserved "the question whether the *Fifth* Amendment imposes the same restrictions on the exercise of personal jurisdiction by a *federal* court." *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 582 U. S. 255, 269 (2017) (emphasis added); see also *Omni Capital Int'l, Ltd.* v. *Rudolf Wolff & Co.*, 484 U. S. 97, 102, n. 5 (1987).

To be sure, this is not our first personal jurisdiction case to have originated in federal court. But under the Federal Rules of Civil Procedure, "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG* v. *Bauman*, 571 U. S. 117, 125 (2014) (citing Rule 4(k)(1)(A)) (applying Fourteenth Amendment analysis to evaluate personal jurisdiction in Federal District Court). Any difference between the Fifth and Fourteenth Amendments is therefore implicated in only a subset of federal cases, such as those in which personal jurisdiction is—as in the PSJVTA—"authorized by a federal statute." Fed. Rule Civ. Proc. 4(k)(1)(C). Because we must determine in these cases the constitutionality of such a statute, the question we have long reserved is now squarely before us.

A

Our current framework for assessing personal jurisdiction under the Fourteenth Amendment derives from *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945). Under that framework, "a tribunal's authority" over a defendant "depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co.* v. *Montana Eighth Judicial Dist. Court*, 592 U. S. 351, 358 (2021) (quoting *International Shoe*, 326 U. S., at 316–317).

Since *International Shoe*, "our decisions have recognized two types of personal jurisdiction: 'general' . . . and 'specific.'" *Bristol-Myers Squibb*, 582 U. S., at 262. General jurisdiction lies in the forum where the defendant is domiciled or "fairly regarded as at home." *Ibid.* (quoting *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, 564 U. S. 915, 924 (2011)). A court in such a forum "may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb*, 582 U. S., at 262. No one contends, however, that the PLO and PA are subject to general jurisdiction in the United States.

"Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co.*, 592 U. S., at 359. A state court may exercise specific jurisdiction "over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 291 (1980) (quoting *International Shoe*, 326 U. S., at 316). The requisite contacts "for this kind of jurisdiction often go by the name 'purposeful availment.'" *Ford Motor Co.*, 592 U. S., at 359. "The defendant, we have said, must take

'some act by which it purposefully avails itself of the privilege of conducting activities within the forum State.'" *Ibid.* (quoting *Hanson* v. *Denckla*, 357 U. S. 235, 253 (1958); alteration omitted). And the plaintiff's claims, we have held, must "deriv[e] from, or [be] connected with," those activities. *Goodyear*, 564 U. S., at 919.

Respondents urge us to apply this familiar Fourteenth Amendment framework here. See Brief for Respondents 49–50. They point out that the Due Process Clauses of the Fifth and Fourteenth Amendments are, textually speaking, nearly identical. Compare Amdt. 5 ("No person shall . . . be deprived of life, liberty, or property, without due process of law.") with Amdt. 14, §1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law.").[2]

We have long recognized, however, that "[w]hile the language of [the two] amendments is the same," "they were engrafted upon the Constitution at different times and in widely different circumstances of our national life." *French* v. *Barber Asphalt Paving Co.*, 181 U. S. 324, 328 (1901). We have therefore anticipated that "questions may arise in which different constructions and applications of their provisions may be proper." *Ibid.*

B

We have repeatedly described the due process limitations imposed by the Fourteenth Amendment as driven by two principles: (1) "treating defendants fairly," and (2) "protecting 'interstate federalism.'" *Ford Motor Co.*, 592 U. S., at 360 (quoting *World-Wide Volkswagen*, 444 U. S., at 293); see also, *e.g.*, *Bristol-Myers Squibb*, 582 U. S., at 263. We have emphasized, therefore, "that the reasonableness of asserting jurisdiction over the defendant must be assessed 'in

_____

[2] Neither the private petitioners nor the United States asks us to revisit the Second Circuit's determination that respondents, as nonsovereign entities, have due process rights. See 835 F. 3d 317, 329 (2016).

the context of our federal system of government,' and stressed that the Due Process Clause ensures not only fairness, but also the 'orderly administration of the laws.'" *World-Wide Volkswagen*, 444 U. S., at 293–294 (quoting *International Shoe*, 326 U. S., at 317, 319; citation omitted). The requirement that a defendant have minimum contacts with the forum, we have said, "can be seen to perform [these] two related, but distinguishable, functions." *World-Wide Volkswagen*, 444 U. S., at 291–292.

This framing follows from "the principles of interstate federalism embodied in the Constitution," *id.*, at 293, and the related protections of due process which ensure that individuals are "subject only to lawful power," *J. McIntyre Machinery, Ltd.* v. *Nicastro*, 564 U. S. 873, 884 (2011) (plurality opinion). State sovereign authority is bounded by the States' respective borders. We explained as much nearly one hundred years ago in *Burnet* v. *Brooks*, 288 U. S. 378, 404 (1933): "The application to the States of the rule of due process . . . comes from the fact that their spheres of activity are enforced and protected by the Constitution." "Due process requires that the limits of jurisdiction shall not be transgressed," and in our constitutional system, "[t]he limits of State power are defined in view of the relation of the States to each other in the Federal Union." *Id.*, at 401.

Our Fourteenth Amendment personal jurisdiction standards emerged in that vein, as "a consequence of territorial limitations on the power of the respective States." *Hanson*, 357 U. S., at 251. Those standards—and in particular, the requirement that a defendant have minimum contacts with the forum State—functionally "ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen*, 444 U. S., at 292.

These interstate federalism concerns, however, do not apply to limitations under the Fifth Amendment upon the

power of the Federal Government and the corollary authority of the federal courts. The Constitution confers upon the Federal Government—and it alone—both nationwide and extraterritorial authority. While "the limitations of the Constitution are barriers bordering the States and preventing them from transcending the limits of their authority," there is no equivalent "ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting that government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." *United States* v. *Bennett*, 232 U. S. 299, 306 (1914).

We observed in *Burnet*, for example, that the geographical limitations on "the taxing power of the States under the due process clause of the Fourteenth Amendment" do not equivalently "restrict the taxing power of the Federal Government," because "[t]he Constitution creates no such relation between the United States and foreign countries as it creates between the States themselves." 288 U. S., at 400–401, 403, 405; accord, *Cook* v. *Tait*, 265 U. S. 47, 55–56 (1924). That same year, we recognized—in light of Congress's "constitutional authority 'to regulate commerce with foreign nations' "—the Federal Government's exclusive authority "[i]n international relations and with respect to foreign intercourse and trade." *Board of Trustees of Univ. of Ill.* v. *United States*, 289 U. S. 48, 56, 59 (1933) (quoting Art. I, §8, cl. 3) (rejecting contention that state instrumentality was immune from paying import duties).

Of particular salience here, we have also recognized the National Government's interest in holding accountable those who perpetrate an "act of violence against" U. S. nationals—who, even when physically outside our borders, remain "under the particular protection" of American law. *Gamble* v. *United States*, 587 U. S. 678, 687 (2019). So too the National Government's corresponding authority to make "the killing of an American abroad" punishable as a

federal offense "that can be prosecuted in [U. S.] courts." *Ibid.* (citing 18 U. S. C. §2332(a)(1)); see also Art. I, §8, cl. 10 (giving Congress power to "define and punish" certain extraterritorial offenses). Indeed, that background context informed the enactment of the ATA, which legislators hoped would "ope[n] the courthouse door to victims of international terrorism" by "extend[ing] the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines." S. Rep. No. 102–342, p. 45 (1992).

Given the distinct territorial reach of the Federal Government's sovereign power, it makes little sense to mechanically import the limitations that the Fourteenth Amendment imposes on the authority of *state* courts, which is restricted consonant with the States' more constrained sovereign spheres. See *Burnet*, 288 U. S., at 401. Indeed, when evaluating state court jurisdiction under the Fourteenth Amendment, we have emphasized that "personal jurisdiction requires" a "sovereign-by-sovereign . . . analysis." *Nicastro*, 564 U. S., at 884 (plurality opinion). And we have acknowledged the straightforward premise that "the United States is a distinct sovereign." *Ibid.* That distinction makes a difference.

Accordingly, to the extent that the Due Process Clauses of the Fourteenth and Fifth Amendments both implicitly limit the jurisdictional authority of courts, they do so with respect to the distinct sovereignties from which those courts derive their authority. Because the State and Federal Governments occupy categorically different sovereign spheres, we decline to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment. Rather, the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority.

C

In the cases before us the Second Circuit, relying on Circuit precedent, declined to apply a different jurisdictional test from the one required under the Fourteenth Amendment. See 82 F. 4th, at 102–105. The PLO and PA likewise urge us not to diverge from Fourteenth Amendment principles. They acknowledge that concerns of interstate federalism cease to be relevant in the Fifth Amendment context, but nonetheless take the view that related considerations of fairness and individual liberty justify the application of equivalent jurisdictional limitations here.

To be sure, we have occasionally framed the personal jurisdiction limits on state courts as "represent[ing] a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty," protecting a defendant from the burden of litigating in an inconvenient forum with which he has little connection. *Omni*, 484 U. S., at 104 (quoting *Insurance Corp. of Ireland*, 456 U. S., at 702). These statements are best understood, however, to reflect the principle that "due process protects the individual's right to be subject only to lawful power." *Nicastro*, 564 U. S., at 884 (plurality opinion). And "whether a judicial judgment is lawful depends on whether the sovereign has authority to render it." *Ibid.*

Interstate federalism concerns accordingly may be *decisive* for Fourteenth Amendment purposes. In *World-Wide Volkswagen Corp.*, for instance, we stressed that "[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State . . . , the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." 444 U. S., at 294. We echoed the point in *Bristol-Myers Squibb*. After acknowledging that "the 'primary concern' is 'the burden on the defendant,' " we emphasized that "[a]ssessing this burden" requires not only "consider[ing] the practical problems

resulting from litigating in the forum," but also "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." 582 U. S., at 263. And so we clarified again: "[A]t times, this federalism interest may be decisive." *Ibid.* While certainly germane to the Fourteenth Amendment inquiry, the "general fairness considerations" invoked by respondents do not compel the application of equivalent jurisdictional limits here. *Nicastro*, 564 U. S., at 883–884 (plurality opinion) (citing *World-Wide Volkswagen*, 444 U. S., at 294).

## III

Although we hold today that the Fifth Amendment does not impose the same jurisdictional limitations as the Fourteenth, we do not purport to delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U. S. courts. On this score, the private petitioners argue that the Fifth Amendment imposes *no* territorial limits on personal jurisdiction. See Brief for Petitioner Miriam Fuld et al. 20. The United States, however, asks us not to embrace—at least for now— this maximalist theory of federal jurisdiction. The Government cautions that the theory is "not easily confirmed as a historical matter," and points to "strong policy reasons . . . against reaching" it, including the possibility that other nations might respond in kind by haling Americans into their courts under expansive theories of jurisdiction. Brief for United States 47–48.

We agree with the Government that we need not address the private petitioners' unbounded jurisdictional theory today. The PSJVTA ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns. We are wary to reach further and bless more attenuated assertions of jurisdiction when the cases before us do not require doing so. Cf. *Asahi*

*Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102, 115 (1987) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." (quoting *United States* v. *First Nat. City Bank*, 379 U. S. 378, 404 (1965) (Harlan, J., dissenting))). It is sufficient unto the day that, whatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts, the PSJVTA does not transgress them.

## A

### 1

The Federal Government's "'inherent' foreign affairs power," "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *American Ins. Assn.* v *Garamendi*, 539 U. S. 396, 416–417, n. 9 (2003) (quoting *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936)). We accordingly review even legislation implicating foreign policy issues to ensure that it has not crossed a constitutional line. See *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 34 (2010). We will not, however, cavalierly interfere with the political branches' "delicate judgments" on matters of foreign affairs. *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 273 (2018) (plurality opinion); see *Bank Markazi* v. *Peterson*, 578 U. S. 212, 215 (2016) (emphasizing that action in this realm "warrants respectful review by courts"). And when the Executive and Congress have spoken with one voice in that sphere, their coordinate action is "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637 (1952) (Jackson, J., concurring).

In respectively passing and signing the PSJVTA into law, Congress and the President made a considered judgment to

subject the PLO and PA to liability in U. S. courts as part of a comprehensive legal response to "halt, deter, and disrupt" acts of international terrorism that threaten the life and limb of American citizens. H. R. Rep. No. 115–858, pp. 7–8 (2018). Combating terrorism is, we have recognized, "an urgent objective of the highest order." *Humanitarian Law Project*, 561 U. S., at 28. The Federal Government, relatedly, has a strong interest in permitting American victims of international terror to pursue justice in domestic courts. Cf. *Gamble*, 587 U. S., at 687 (recognizing interest of United States in prosecuting "the killing of an American abroad . . . in [U. S.] courts"). Indeed, a "key premise" of the PSJVTA was Congress's desire to facilitate "the adjudication of ATA claims like the plaintiffs'," which it views as "vital" to "furthering the safety of Americans abroad, facilitating compensation for injuries or death, and deterring international terrorism." Brief for United States 29, 36 (citing Brief for Sen. Charles Grassley et al. as *Amici Curiae* on Pet. for Cert. 18–19; H. R. Rep. No. 115–858, at 3–4, 7–8); see also §903(d)(1)(A), 133 Stat. 3085 (providing that the PSVJTA "should be liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism"). The PSJVTA thus reflects the political branches' balanced judgment of competing concerns over "sensitive and weighty interests of national security and foreign affairs" and fairness to these particular defendants—entities with which the Federal Government has complex, longstanding relationships in which concerns over terrorism have long been at the fore. *Humanitarian Law Project*, 561 U. S., at 33–34; see Brief for United States 38, 43.

The PSJVTA is also suitably limited to those ends. It does not put respondents at broad risk of being haled into U. S. courts for myriad civil liability actions. Rather, the statute applies only to ATA cases, a narrow category of claims that provide civil remedies only for Americans in-

jured by acts of international terrorism. See 4 Wright, Federal Practice and Procedure §1068.1, at 733 ("[W]hen Congress has undertaken to enact a nationwide service statute applicable to a certain class of disputes, that statute should be afforded substantial weight as a legislative articulation of federal social policy."). It is permissible for the Federal Government to craft a narrow jurisdictional provision that ensures, as part of a broader foreign policy agenda, that Americans injured or killed by acts of terror have an adequate forum in which to vindicate their right to ATA compensation.

The statute's jurisdiction triggering predicates are likewise narrow. The payments prong furthers the Federal Government's longstanding policy of deterring these sorts of payments, which the United States has determined promote acts of terror that may injure or kill Americans. See Taylor Force Act, 132 Stat. 1143; Reply Brief for United States 2.[3] And the activities prong—which predicates jurisdiction on respondents' conduct within the United States—represents a continuation of the Federal Government's longstanding, nuanced policy delineating the operations in which respondents may permissibly engage on U. S. soil. See Brief for United States 43. Far from an anything-goes approach, then, the PSJVTA ties jurisdiction to specific and narrow conduct that directly implicates issues of sensitive and ongoing concern in respondents' relationships with the United States.

_____

[3] Respondents dispute that such payments reward or incentivize terrorism, and instead characterize the payments as part of a general welfare system. See Brief for Respondents 32–33. Congress has suggested it thinks otherwise. See Taylor Force Act, 132 Stat. 1143. We express no view on the proper characterization of the program. See *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 35 (2010). Nor do respondents' statements that they "formally revoked" the payments program in February 2025 bear on our analysis. See Brief for Respondents 31–32; Reply Brief for United States 11.

The PSJVTA also limits jurisdiction to only two enumerated nonsovereign foreign entities, both of which have been subject to a series of congressional enactments aimed at deterring terrorism and accomplishing other foreign relations objectives. See, *e.g.*, 8 U. S. C. §1182(a)(3)(B); 22 U. S. C. §§286w, 2227(a), 2378b(a) and (b), 2378c(a), 2378c–1(a), 5201, 5202. Far from haling just any run-of-the-mill private defendant into American courts, the PSJVTA represents but one targeted aspect of a multifaceted foreign policy toward these two *sui generis* foreign entities, both of which exercise governmental functions in a geopolitically sensitive region and have decades of "meaningful 'contacts, ties, [and] relations' " with the United States. *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 472 (1985) (quoting *International Shoe*, 326 U. S., at 319).

2

Respondents, for their part, contend that petitioners "greatly overstate the significance of the PSJVTA" to Congress's antiterror efforts. Brief for Respondents 45. They point out that the statute only applies to them, but not any "other terrorist group or state-sponsor of terrorism." *Id.*, at 46; see also *id.*, at 69–70. If anything, though, this supposed underinclusiveness only serves to reinforce that the statute reflects "delicate judgments" on matters of foreign policy that are in "the prerogative of the political branches to make." *Jesner*, 584 U. S., at 273 (plurality opinion). "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Humanitarian Law Project*, 561 U. S., at 35. Rather than subject to jurisdiction in its courts a broader range of potential defendants—each of which presumably would implicate distinct foreign affairs concerns—the Federal Government took a narrower tack. We decline to second guess why Congress did not use

a blunter remedial tool to achieve its desired foreign policy ends. And moreover, the statute's targeted applicability put the PLO and PA on full notice that they could be subject "to personal jurisdiction" in ATA suits in U. S. courts. 18 U. S. C. §§2334(e)(1), (5).

In respondents' view, deference to the political branches is also unwarranted here because "Congress's explicit purpose [was] to reverse federal decisions" holding that the same activities that trigger jurisdiction under the PSJVTA were "insufficient to support the exercise of jurisdiction under the Due Process Clause." Brief for Respondents 14, 45. But we hold today that those lower courts applied the wrong constitutional test.

3

We need not separately consider whether the statute comports with our cases addressing the circumstances under which a defendant may be deemed, consistent with due process, to have consented to jurisdiction. See, *e.g.*, *Mallory* v. *Norfolk Southern R. Co.*, 600 U. S. 122 (2023). Respondents' consent-based arguments rest on the premise that Congress could not in the PSJVTA "transform constitutionally-insufficient conduct overseas into grounds for 'deemed consent' to personal jurisdiction in the United States." Brief for Respondents 31. The Court of Appeals thought similarly. See 82 F. 4th, at 91. Since we hold that the statute ties the assertion of jurisdiction to predicate conduct that in and of itself bears a meaningful relationship to the United States, we need not further consider the matter through the lens of consent.

B

Although we have already made clear that the Due Process Clause of the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard,

the prospect remains that the Fifth Amendment might entail a similar "inquiry into the reasonableness of the assertion of jurisdiction in the particular case." *Asahi*, 480 U. S., at 115. We need not determine whether such analysis is constitutionally required because, even if it were, the PSVJTA easily comports with the factors we have previously applied to determine "the reasonableness of the exercise of jurisdiction" even under the Fourteenth Amendment. *Id.*, at 113. Reasonableness, we have explained, will depend in each case "on an evaluation of several factors," including "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Ibid.* The PSJVTA ticks all three boxes.

For largely the same reasons that we conclude there is a close connection between the PSJVTA's predicate conduct and the United States, it follows that the forum sovereign has a substantial interest in adjudicating the dispute. We will not belabor that the Federal Government has an exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable. For similar reasons, American plaintiffs have a strong interest in seeking justice through an ATA damages action in U. S. courts. Cf. *Ford Motor Co.*, 592 U. S., at 368 (recognizing the "significant interests" of a forum State in "providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors" (internal quotation marks omitted)).

Respondents, moreover, "do not complain of any lack of notice or contend that litigating these cases in the United States would force them to bear an unfair or unmanageable burden." Reply Brief for United States 9. And as the United States points out, it seems implausible to think otherwise. See Brief for United States 38. Respondents are "sophisticated international organizations" that operate "billion-dollar budgets" and "govern a territory recognized

as a sovereign state by many other countries." *Ibid.*; 101 F. 4th, at 208 (Menashi, J., dissenting from denial of rehearing en banc). They maintain embassies, missions, and delegations around the world and a longstanding "presence in the United States" which continues to this day. Brief for United States 3, 38. Nor could it have come as much of a surprise that respondents were haled into U. S. courts in these cases. They have litigated ATA suits here for decades, and in the PSJVTA were put on clear notice—far more than most defendants in the mine-run of litigation—that continuing to engage in certain specified conduct would open them up to potential federal court jurisdiction. See *ibid.*

Under these circumstances, we cannot say that the PSJVTA's jurisdictional rule makes "litigation 'so gravely difficult and inconvenient,'" *Burger King*, 471 U. S., at 478, as to render the "exercise of personal jurisdiction . . . unreasonable and unfair," *Asahi*, 480 U. S., at 116.

\*     \*     \*

The PSJVTA reasonably ties the assertion of federal jurisdiction over the PLO and PA to conduct that involves the United States and implicates sensitive foreign policy matters within the prerogative of the political branches. We hold that the statute's provision for personal jurisdiction comports with the Due Process Clause of the Fifth Amendment.

The judgments of the Court of Appeals for the Second Circuit are reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

Nos. 24–20 and 24–151

---

### MIRIAM FULD, ET AL., PETITIONERS
24–20                    *v.*
### PALESTINE LIBERATION ORGANIZATION, ET AL.

### EVA WALDMAN, ET AL., PETITIONERS
*v.*
### PALESTINE LIBERATION ORGANIZATION, ET AL.

### UNITED STATES, PETITIONER
24–151                    *v.*
### PALESTINE LIBERATION ORGANIZATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 20, 2025]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins as to Part II, concurring in the judgment.

The Court properly holds that the personal-jurisdiction provisions of the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), §903, 133 Stat. 3082–3085, 18 U. S. C. §§2333, 2334, do not violate respondents' claimed rights under the Due Process Clause of the Fifth Amendment. See *ante*, 14–21. In reaching this conclusion, the majority recognizes that the Fourteenth Amendment's "minimum contacts standard" does not apply to the Fifth Amendment's Due Process Clause. *Ante,* at 12. But, rather than decide what standard *does* apply, the Court holds only that the Fifth Amendment at least permits a statute such as the PSJVTA that "ties federal jurisdiction to conduct

closely related to the United States that implicates im-
portant foreign policy concerns." *Ante,* at 14. The Court
leaves for another day the task of defining "the Fifth
Amendment's outer limits on the territorial jurisdiction of
federal courts." *Ibid.*

I would take a different approach. When interpreting
constitutional provisions, we must look to "the text of the
Constitution" as well as "historical evidence from the fram-
ing" that can illuminate "the intent of those who drafted
and ratified it." *McIntyre* v. *Ohio Elections Comm'n*, 514
U. S. 334, 370 (1995) (THOMAS, J., concurring in judgment).
The critical question in these cases is what boundaries the
Fifth Amendment's due process guarantee, as originally un-
derstood, places on the Federal Government's power to ex-
tend personal jurisdiction over respondents. Historical ev-
idence demonstrates that the answer is "none." "Because
the majority has adopted an analysis that is largely uncon-
nected to the Constitution's text and history, I concur only
in the judgment." *Id.*, at 371.

## I

"We start with the text of the Fifth Amendment" and in-
terpret its provisions in light of how they were "'understood
in 1791.'" *Gamble* v. *United States*, 587 U. S. 678, 683
(2019); see also *McIntyre*, 514 U. S., at 370–371 (opinion of
THOMAS, J.). The Fifth Amendment's Due Process Clause
provides that "[n]o person" shall "be deprived of life, liberty,
or property, without due process of law." Thus, to show that
the PSJVTA's jurisdictional provisions run afoul of the
Fifth Amendment's due process protections, respondents
must establish both that they are "person[s]" protected by
the Fifth Amendment and that the PSJVTA transgresses
their due process rights. These requirements in turn raise
two threshold issues: whether respondents enjoy constitu-
tional rights in the first place, and what "due process of law"
requires. While my conclusions as to both threshold issues

remain tentative, there are strong reasons to think that each poses an independently fatal problem for respondents. At a minimum, however, I would conclude today that the PSJVTA's jurisdictional provisions do not violate any plausible understanding of due process.

## A

I am skeptical that entities such as the Palestine Liberation Organization (PLO) and the Palestinian Authority (PA) enjoy any constitutional rights at all, let alone qualify as "person[s]" for purposes of the Fifth Amendment.

### 1

The PLO and the PA are foreign bodies that are not recognized as sovereign by the United States, but that nevertheless carry out governmental functions. *Ante,* at 1–2. Although the Federal Government does not take a position on the question whether such foreign nonsovereign governmental bodies have constitutional rights, Tr. of Oral Arg. 43–45, the Executive Branch has for decades endorsed principles that suggest that the Constitution does not protect these types of entities.

Begin with the Executive's approach to "the nature of foreign sovereigns." Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Org., 11 Op. OLC 104, 106 (1987). To be sure, the United States does not recognize respondents as sovereign states, *ante,* at 2, but the Executive's view of foreign nations' constitutional rights nevertheless may shed light on respondents' assertion of constitutional rights here. Foreign sovereigns, the Office of Legal Counsel has explained, each "interac[t] with the United States as a foreign, co-equal sovereign." 11 Op. OLC, at 106. "[T]he United States interacts with foreign states not within the constitutional system, but as a juridical equal, on the level of international law and diplomacy." *Id.*, at 107. It follows that no sovereign

can be "'amenable,' or subject to the other," *ibid.*, for such an arrangement would violate the precept that "the body of the nation, the State, remains absolutely free," E. de Vattel, The Law of Nations, Preliminaries, §4, p. lv (J. Chitty ed. 1854).[1]  Thus, "[a] foreign nation, . . . unlike a foreign national, does not have rights under the Fifth Amendment." Presidential Authority To Settle the Iranian Crisis, 4A Op. OLC 248, 260, n. 9 (1980).

The Executive Branch has reached the same conclusion regarding domestic nonsovereign governing bodies, such as United States Territories.  See Mutual Consent Provisions in the Guam Commonwealth Legislation, 1994 WL 16193765, *5 (OLC, July 28, 1994) ("non-state areas" are "governmental bodies" that "are not protected by the Due Process Clause of the Fifth Amendment").  "Territories are but political subdivisions of the outlying dominion of the United States" and thus relate to the Federal Government similarly to the way in which municipalities relate "to the respective States." *National Bank* v. *County of Yankton*, 101 U. S. 129, 133 (1880).  Given that a municipality is "created by a state for the better ordering of government," and thus has "no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator," *Williams* v. *Mayor of Baltimore*, 289 U. S. 36, 40 (1933); see also *Newark* v. *New Jersey*, 262 U. S. 192, 196 (1923), the Executive's conclusion that the same logic should apply to Territories is reasonable.  Accord, *e.g.*, *Puerto Rico Public Housing Admin.* v. *United States Dept. of Housing and Urban Development*, 59 F. Supp. 2d 310,

––––––––––

[1] Vattel was "widely consulted by the constitutional generation in the United States," and was "invariably invoked as authoritative on matters of international law by the likes of Alexander Hamilton, James Madison, James Wilson, Edmund Randolph, Thomas Jefferson, John Marshall, Joseph Story and James Kent, among others."  M. Ramsey, Executive Agreements and the (Non)treaty Power, 77 N. C. L. Rev. 133, 169–170 (1998) (internal quotation marks omitted).

325 (PR 1999) (instrumentalities of the Commonwealth of Puerto Rico are "'non-persons'" for purposes of constitutional claims).

Assuming that the Executive Branch is correct that neither foreign sovereign governments nor domestic nonsovereign Territories enjoy constitutional rights, it is unclear why the Constitution would treat foreign nonsovereign governmental entities such as respondents differently. In the Executive's own words, the PLO is at bottom "a foreign political entity" that "'lies outside the structure of the union.'" 11 Op. OLC, at 107 (quoting *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 330 (1934)). Neither it nor the PA has taken any "general obligation to abide by the constitutional norms to which the federal government and the several states are subject, nor are there any effective means to place [them] on parity with the United States or the states for purposes of enforcement of particular norms." 11 Op. OLC, at 107 (internal quotation marks omitted). It would seem to follow that neither entity enjoys constitutional protections.

In addition to the conclusions of the Executive Branch, decisions from this Court further suggest that entities like respondents may not be "person[s]" protected by the Fifth Amendment. In *South Carolina* v. *Katzenbach*, 383 U. S. 301, 323 (1966), the Court held that "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union." Decades later, the Court cited *Katzenbach* to suggest that "a foreign state" might not be "a 'person' for purposes of the Due Process Clause." *Republic of Argentina* v. *Weltover, Inc.*, 504 U. S. 607, 619 (1992).

"Since *Weltover*, the consensus of circuit courts has followed the Supreme Court's lead and definitively held that foreign states are not entitled to the protections of the Due Process Clause." *CC/Devas (Mauritius) Ltd.* v. *Antrix*

*Corp.*, 91 F. 4th 1340, 1350 (CA9 2024) (Bumatay, J., dissenting from denial of rehearing en banc). The D. C. Circuit thoroughly analyzed the issue in *Price* v. *Socialist People's Libyan Arab Jamahiriya*, 294 F. 3d 82 (2002). Compared to foreign nations, which are "entirely alien to our constitutional system," the court explained, domestic States "derive important benefits and must abide by significant limitations." *Id.*, at 96. It would therefore be "highly incongruous to afford greater Fifth Amendment rights to foreign nations." *Ibid*. At least two other Circuits have reached the same conclusion. See *Frontera Resources Azerbaijan Corp.* v. *State Oil Co. of Azerbaijan Republic*, 582 F. 3d 393, 399 (CA2 2009) ("If the States, as sovereigns that are part of the Union, cannot 'avail themselves of the fundamental safeguards of the Due Process Clause,' we do not see why foreign states, as sovereigns wholly outside the Union, should be in a more favored position" (citation omitted)); *Abelesz* v. *Magyar Nemzeti Bank*, 692 F. 3d 661, 694 (CA7 2012) (similar).

These courts' and the Executive's determinations that foreign sovereigns do not fall within the "person[s]" protected by the Fifth Amendment's Due Process Clause seem very likely correct, and it is difficult to see why the Constitution would afford better treatment to foreign nonsovereign governmental entities. To conclude otherwise would imply that foreign governmental entities may receive greater constitutional protections by engaging in conduct that leads the United States to refuse to recognize their sovereignty. I seriously doubt that the Constitution compels such a result. As the Office of Legal Counsel concluded, "[i]t would be anomalous if the Executive's decision to withhold recognition from a foreign political entity . . . invested that entity with rights greater than those enjoyed by friendly sovereigns present in the United States." 11 Op. OLC, at 120, n. 7.

2

Nevertheless, some lower courts have concluded that the Constitution treats nonsovereign foreign governing bodies like respondents more favorably than it treats recognized sovereigns, States, Territories, and municipalities. In *Livnat* v. *Palestinian Authority*, 851 F. 3d 45, 52 (2017), for example, the D. C. Circuit held that the Due Process Clause applies to the PA and the PLO, distinguishing *Price* as "appl[ying] to sovereigns alone." Because neither the PA nor the PLO are "'recognized by the United States government as sovereigns,'" the court reasoned, they are therefore "protected by the Due Process Clause." *Ibid.*

The D. C. Circuit's opinion could be read to embrace a dichotomy in which entities are either nonsovereigns, which enjoy constitutional rights, or sovereigns, which do not. See *ibid.*; accord, *Waldman* v. *Palestine Liberation Org.*, 835 F. 3d 317, 329 (CA2 2016) (noting that "sovereign states are not entitled to due process protection," but rejecting the argument that respondents lack such protection because "neither the PLO nor the PA is recognized by the United States as a sovereign state"). Respondents rely on that theory here, arguing that a constitutional "binary" applies to the question whether an entity is a "person" under the Fifth Amendment: An entity either is "a person for purposes of the Due Process Clause," or it is "a sovereign state"; there is no "no-man's-land" in which the entity is "neither a sovereign state nor a person." Tr. of Oral Arg. 91.

While I agree with a "binary" framework insofar as the Due Process Clause either applies to respondents or it does not, I do not see how sovereignty supplies the dividing line. It is uncontroversial that entities such as municipalities and United States Territories are not sovereigns. See *County of Yankton*, 101 U. S., at 133; Mutual Consent Provisions in the Guam Commonwealth Legislation, 1994 WL 16193765, *5. Under respondents' framework, this nonsovereign character would seem to compel the conclusion that

municipalities and Territories thus must be "person[s]" with constitutional rights. For reasons already discussed, see *supra*, at 4–5, this result is dubious, see *Williams*, 289 U. S., at 40 (municipalities have "no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator"); accord, *e.g.*, *East St. Louis* v. *Circuit Ct. for Twentieth Jud. Cir., St. Clair Cty.,* 986 F. 2d 1142, 1144 (CA7 1993) ("Municipalities . . . are not 'persons' within the meaning of the Due Process Clause"). Further, assuming the Court was correct to conclude that the Due Process Clause of the Fifth Amendment does not "encompass the States of the Union," *Katzenbach*, 383 U. S., at 323, it is rather odd to think that the Constitution would provide greater constitutional rights to Territories or the political subdivisions of States than to the States themselves.

Neither the private petitioners nor the Government pressed the argument that the Constitution does not protect respondents at all, so we should not resolve the cases on that basis. See, *e.g.*, H. Proctor, "Will the Meaning of the Second Amendment Change . . . ?": Party Presentation and Stare Decisis in Text-and-History Cases, 98 N. Y. U. L. Rev. 453, 463, n. 70 (2023) (cautioning against courts attempting to "correc[t] for deficiencies in party presentation"). But, the question whether entities like respondents receive any constitutional protection is antecedent to whatever constitutional arguments they might make, and I am hopeful that in an appropriate case parties will brief and the Court will address this issue.[2]

---

[2] One *amicus* raises the argument that "certain governmental entities, including 'foreign states,'" are not "'person[s]'" under the original meaning of the Fifth Amendment. Brief for Chamber of Commerce of the United States of America as *Amicus Curiae* 6; see also, *e.g.*, A. Scalia & B. Garner, Reading Law 273 (2012) ("[T]he word *person* traditionally excludes the sovereign"). This textual argument has generated scholarly debate. See, *e.g.*, Brief for Professor Ingrid (Wuerth) Brunk as *Amicus*

## B

Even assuming that the PLO and the PA are "person[s]" protected by the Fifth Amendment, respondents still must grapple with another threshold inquiry: whether the Due Process Clause imposes any limits on the legislative power.

"The four words—due process of law—have been the center of substantial legal debate over the years." *In re Winship*, 397 U. S. 358, 378 (1970) (Black, J., dissenting). As I have previously explained, the Due Process Clause may have originally been understood to require only that our Government "'proceed according to the "law of the land"— that is, according to written constitutional and statutory provisions,'" before depriving someone of life, liberty, or property. *Johnson* v. *United States*, 576 U. S. 591, 623 (2015) (opinion concurring in judgment). Numerous scholars have supported this view, "conclud[ing] that 'considerable historical evidence supports the position that "due process of law" was a separation-of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law.'" *Ibid.* (quoting D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 272 (1985)); see also, *e.g.*, E. Corwin, The Doctrine of Due Process of Law Before the Civil War, 24 Harv. L. Rev. 366, 370– 373 (1911) (listing reasons to conclude that "the phrase 'law of the land'" did not "import any limitation upon legislative power"); 4 Papers of Alexander Hamilton 35 (H. Syrett & J. Cooke eds. 1962) ("The words '*due process*' . . . can never be referred to an act of legislature").

Others have disagreed. For example, some scholars have argued that "as originally understood, 'the principle of due process' required, among other things, that 'statutes that

_____

*Curiae* in *CC/Devas (Mauritius) Ltd.* v. *Antrix Corp.*, O. T. 2024, No. 23– 1201, pp. 3–4 (arguing that, at the time of ratification, "the word 'person' was routinely used to describe states").

purported to empower the other branches to deprive persons of rights without adequate procedural guarantees [be] subject to judicial review.'" *Johnson*, 576 U. S., at 623 (opinion of THOMAS, J.) (quoting N. Chapman & M. McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1679 (2012)).

And, in *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856), the Court itself concluded that the mere existence of a legislative enactment was insufficient on its own to satisfy due process under the Fifth Amendment. Despite acknowledging that "[t]he words, 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in *Magna Charta*," the Court concluded that the Due Process Clause "is a restraint on the legislative as well as on the executive and judicial powers of the government." *Id.*, at 276. The Court famously declared that due process must comport with "those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country." *Id.*, at 277. These requirements generally include an independent judge, "regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings." *Id.*, at 280. The Court's decision in *Murray's Lessee* "opened the door to a dramatic reinvention of the Due Process of Law Clause as a check on the statutory enactment of novel methods of procedure." M. Crema & L. Solum, The Original Meaning of "Due Process of Law" in the Fifth Amendment, 108 Va. L. Rev. 447, 519 (2022).

In these cases, "I need not choose between these two understandings of 'due process of law.'" *Johnson*, 576 U. S., at 623 (opinion of THOMAS, J.). If the "law of the land" view of due process is correct and requires only that Congress have authorized the deprivation of life, liberty, or property

that the Federal Government effects, see *Sessions* v. *Dimaya*, 584 U. S. 148, 207 (2018) (THOMAS, J., dissenting), then the PSJVTA's proper enactment resolves the question presented. But, as explained next, even assuming that "settled usages and modes of proceeding" govern the due process inquiry, *Murray's Lessee*, 18 How., at 277, respondents' due process argument still fails.

## II

The Fifth Amendment was never understood to constrain Congress's ability to extend federal jurisdiction. The Federal Government has always possessed the power to extend its jurisdiction beyond the Nation's borders, and, as understood in 1791, the Fifth Amendment did not limit this sovereign prerogative. Rather, insofar as any limits on extraterritorial jurisdiction existed, they stemmed from general principles of international law. But, those principles were defeasible, subconstitutional rules that the sovereign could override through clear command. This understanding respects the Constitution's design by reserving matters of foreign affairs to the political branches.

### A

Congress's and the Judiciary's extraterritorial powers are evident in the Constitution. The text is explicit: Congress may "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," and it may "make Rules concerning Captures on Land and Water." Art. I, §8, cls. 10, 11.

By design, the authority of "the Judicial" branch was to be "commensurate to the legislative and executive Authority." 1 Records of the Federal Convention 237, n. 18 (M. Farrand ed., 1911) (statement of James Wilson). "The judicial Power" accordingly "extend[s] to all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States"; "to all Cases of admiralty and maritime

Jurisdiction; and to "all Crimes," including those "not committed within any State." Art. III, §2, cls. 1, 3.

The First Congress, "many of whose members had taken part in framing" the Constitution, *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 297 (1888), exercised its authority to prescribe extraterritorial jurisdiction in the Judiciary Act of 1789. See §9, 1 Stat. 76–77 (granting federal courts jurisdiction over "civil causes of admiralty and maritime jurisdiction" arising "upon the high seas"); see also, *e.g.*, N. Chapman, Due Process Abroad, 112 Nw. U. L. Rev. 377, 409 (2017) ("[O]ne of the federal government's top priorities" postratification was "[t]he prosecution and punishment of extraterritorial crimes, including crimes committed by aliens"). This "actio[n] of the First Congress" is "of course persuasive evidence of what the Constitution means." *Harmelin* v. *Michigan*, 501 U. S. 957, 980 (1991) (opinion of Scalia, J.); see, *e.g.*, *Marsh* v. *Chambers*, 463 U. S. 783, 788–790 (1983). Early treatises further reinforce the conclusion that the Federal Government possessed the power to exercise its jurisdiction beyond its borders, noting for example that "for the purpose of giving jurisdiction," "on *whom* or *where* a piratical offense has been committed" is irrelevant. 1 J. Kent, Commentaries on American Law 174 (1826).

Constitutional text, postratification practice, and early commentary thus demonstrate that Congress and the Judiciary can exercise jurisdiction beyond the United States. The question turns to what, if anything, limits this power.

### B

Preratification and postratification courts observed limits on their own and each other's extraterritorial authority. Those limits were originally understood to derive from the international law of nations, not the Constitution. But, Congress always possessed the power to legislate beyond the boundaries that these international-law principles imposed.

THOMAS, J., concurring in judgment

1

Early courts routinely applied law-of-nations principles under which personal jurisdiction was "typically a problem in recognition"; that is, "[t]he question for American courts was whether [foreign] judgments would be recognized and enforced." S. Sachs, *Pennoyer* Was Right, 95 Texas L. Rev. 1249, 1270 (2017) (Sachs 2017). Because "[e]arly American states stood in much the same position as foreign nations," they would review each other's jurisdiction and refuse to recognize or enforce foreign judgments that exceeded commonly understood jurisdictional limits. *Id.*, at 1273–1274. In *Jenkins* v. *Putnam*, 1 S. C. L. 8 (1784) (*per curiam*), for example, a South Carolina court recognized that whether a North Carolina admiralty court's judgment was due "faith and credit" pursuant to "[t]he act of confederation . . . and the law of nations" turned on whether the foreign court had "competent jurisdiction" to enter the judgment. *Id.*, at 9–10; see also, *e.g.*, *Kibbe* v. *Kibbe*, 1 Kirby 119, 126 (Conn. Super. Ct. 1786) (concluding that a Massachusetts court lacked "legal jurisdiction of the cause" and thus rejecting creditors' attempt to have the court recognize out-of-state judgment).

Courts "continued to reason this way" after the Fifth Amendment's ratification in 1791. Sachs 2017, at 1275. Riding circuit, Justice Story rejected the application of a Massachusetts personal-jurisdiction statute to an absent Louisiana citizen based on the "universal" "principle," "consonant with the general principles of justice, that the legislature of a state can bind no more than the persons and property within its territorial jurisdiction." *Flower* v. *Parker*, 9 F. Cas. 323, 324–325 (No. 4,891) (CC Mass. 1823). This Court reinforced those principles in *D'Arcy* v. *Ketchum*, 11 How. 165, 174 (1851), in which it addressed whether a creditor could enforce a New York judgment in a Louisiana federal court against a "citizen of Louisiana not

served with process." Observing that neither an act of Congress nor a provision of the Constitution had displaced the "well-established rules of international law," the Court concluded that following such a procedure to enforce the New York judgment would be "deemed an illegitimate assumption of power." *Id.*, at 174–176. At bottom, this international-law approach to personal jurisdiction meant that when one government attempted to exercise "jurisdiction which, according to the law of nations, its sovereign could not confer," that government's "sentences [were] not regarded by foreign courts" irrespective of whether they were valid "within the dominions of the prince from whom the authority is derived." *Rose* v. *Himely*, 4 Cranch 241, 276–277 (1808) (Marshall, C. J., for the Court).

Absent from this approach to personal jurisdiction was any consideration of due process. The Court's omission of such analysis in *D'Arcy* is illustrative: The Court could have analyzed the legitimacy of enforcing the New York judgment under the New York Constitution—which "contained an exact replica of the Fifth Amendment's Due Process Clause"—but it conspicuously declined to do so. See Brief for Professor Stephen E. Sachs as *Amicus Curiae* 10 (citing N. Y. Const. of 1846, Art. I, §6). Due process was not the issue; the "well-established rules of international law" were. 11 How., at 174.

2

These rules of international law, however, were always understood to be defeasible. Even if Congress generally respected such rules, it retained the power to override them through clear statutory command.

Founding-era courts may have sought to avoid "constru[ing]" statutes "to violate the law of nations if any other possible construction remain[ed]," but they understood that the legislature could depart from this international base-

line "by express words or a very plain and necessary implication." *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) (Marshall, C. J., for the Court); see also, *e.g.*, *Talbot* v. *Seeman*, 1 Cranch 1, 43 (1801) ("[T]he laws of the United States ought not, *if it be avoidable*, so to be construed as to infract the common principles and usages of nations" (emphasis added)). A nation "might always 'exercise its territorial powers in a manner not consonant to the usages and received obligations of the civilized world'"; even if it were "'considered as violating its faith,'" the rules still would be "valid within that nation's courts." S. Sachs, The Unlimited Jurisdiction of the Federal Courts, 106 Va. L. Rev. 1703, 1722 (2020) (Sachs 2020) (quoting *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 137 (1812)); accord, *e.g.*, *United States* v. *Yousef*, 327 F. 3d 56, 108 (CA2 2003) (the "claim that principles of customary international law constrain Congress's power to enact laws that proscribe extraterritorial conduct is simply wrong").

This approach reflects the "longstanding principle of American law" that congressional statutes are "meant to apply only within the territorial jurisdiction of the United States"—"*unless* a contrary intent appears." *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 (1991) (emphasis added; internal quotation marks omitted); cf. *Blackmer* v. *United States*, 284 U. S. 421, 437 (1932) (whether "the legislation of Congress" applies extraterritorially to "citizens of the United States in foreign countries" is a "question of . . . construction, not of legislative power"). Given that principles of international law formed the basis for early understandings of personal jurisdiction, Congress's general ability to override those principles strongly implies its power to effect extraterritorial jurisdiction beyond what the law of nations might permit.

This conclusion becomes nearly inescapable when taking into account the views of early jurists who considered the question. For example, Justice Johnson, while dissenting

on a separate point, acknowledged as an "eternal principl[e] of justice" the precept "that jurisdiction cannot be justly exercised by a state over property not within the reach of its process, or over persons not owing them allegiance or . . . found within their limits." *Mills* v. *Duryee*, 7 Cranch 481, 486 (1813). Nevertheless, he had no trouble concluding that courts could "dispense with" that principle "when compelled by positive statute." *Ibid.*; see Sachs 2020, at 1722.

Justice Story shared this view. In *Picquet* v. *Swan*, 19 F. Cas. 609, 613 (No. 11,134) (CC Mass. 1828), the plaintiff sued a defendant residing abroad through jurisdictionally dubious means, the implications of which might suggest that "a subject of England, or France, or Russia . . . may be summoned from the other end of the globe to obey our process, and submit to the judgment of our courts." Justice Story concluded that Congress had not authorized the plaintiff's expansive theory of federal jurisdiction, which would interfere with "principles of . . . immutable justice." *Id.*, at 614. But, he made clear that this absence of congressional action was due to a lack of will, not power: "If congress had prescribed such a rule, the court would certainly be bound to follow it, and proceed upon the law." *Id.*, at 615. In other words, "foreign-based defendants were owed no more than service authorized by Congress before being haled into our federal courts." *Antrix Corp.*, 91 F. 4th, at 1352 (opinion of Bumatay, J.) (citing *Picquet*, 19 F. Cas., at 613, 615–616).

This Court eventually endorsed Justice Story's analysis. In *Toland* v. *Sprague*, 12 Pet. 300, 302 (1838), as in *Picquet*, the Court addressed whether a federal statute authorized a plaintiff's attempt to have the federal court exercise personal jurisdiction over a defendant residing abroad. Assigning "great force" to the reasoning of *Picquet*, the *Toland* Court held that Congress had not contemplated federal jurisdiction over those "who were in a foreign jurisdiction," and thus had not extended "the reach of the process of the

courts" over those individuals. 12 Pet., at 328–330. Nevertheless, the Court followed Justice Story's analysis and concluded that federal courts would be bound to exercise such jurisdiction if Congress required it through "positive legislation," no matter how "unjust." *Id.*, at 329–330; see also 101 F. 4th 190, 218–219 (CA2 2024) (Menashi, J., dissenting from denial of rehearing en banc) (detailing the *Toland* Court's "embrac[e]" of Justice Story's reasoning).

Subsequent historical and legal developments, including the ratification of the Fourteenth Amendment, have not changed the fundamental point that the Fifth Amendment's Due Process Clause does not territorially confine the Federal Government's jurisdiction.[3] During the *Lochner* era, for example, this Court began to determine that the Fourteenth Amendment restricts *States'* ability to adjudicate cases involving conduct beyond their borders. See, *e.g.*, *Baker* v. *Baker, Eccles & Co.*, 242 U. S. 394, 403 (1917). But, the Court during that period continued to recognize that the Fifth Amendment provides "no ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting [the federal] government off from the exertion of

---

[3] Until today, this Court had continually left open the question whether the Fifth Amendment's Due Process Clause constrains the Federal Government to the same extent that the Fourteenth Amendment's Due Process Clause limits the States. See, *e.g.*, *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 582 U. S. 255, 268–269 (2017); *Omni Capital Int'l, Ltd.* v. *Rudolf Wolff & Co.*, 484 U. S. 97, 102–103, n. 5 (1987). That reservation was appropriate. Because it makes little sense to interpret the Fifth Amendment's Due Process Clause according to this Court's interpretation of the later ratified, identical language in the Fourteenth Amendment, I agree with the majority that the Fourteenth Amendment's "minimum contacts" due process inquiry is inapposite here. *Ante,* at 12. But, it may well be that the Due Process Clause of the Fifth Amendment should inform our understanding of parallel language in the Fourteenth Amendment.

powers which inherently belong to it by virtue of its sovereignty." *United States* v. *Bennett*, 232 U. S. 299, 306 (1914); see also Brief for Petitioners in No. 24–20, pp. 27–28.

Cases from the founding era onward have continually reaffirmed that the Fifth Amendment was never understood to impose limits on the exercise of personal jurisdiction. Any such limits derived from international law, which Congress could override.

C

That Congress *may* override general principles of international law does not imply that it *should*, but instead that the relevant considerations are not constitutional ones. Serious nonconstitutional considerations include implications for foreign policy. But, concerns over foreign affairs are no reason to impose constitutional limits on federal courts' extraterritorial jurisdiction. Just the opposite—the implications of such limitations on the political branches' power to conduct foreign policy reinforce the conclusion that the Constitution does not inhibit the Federal Government's ability to extend its jurisdiction extraterritorially.

As the foregoing demonstrates, Congress has the power to subject foreign nationals to what they might view as overly broad jurisdiction. In response, countries may decide to enact "'retaliatory' jurisdictional provisions" that "empower [their] national courts to exercise jurisdiction over [American citizens] in circumstances where [American] courts . . . would have asserted jurisdiction." G. Born, Reflections on Judicial Jurisdiction in International Cases, 17 Ga. J. Int'l & Comp. L. 1, 15 (1987) (Born); see also *ante,* at 14. Constitutionally unchecked authority to extend federal jurisdiction thus undeniably has the potential to generate repercussions in foreign affairs. See Tr. of Oral Arg. 55–56 (counsel for the Federal Government acknowledging that the Government could face "problems" with "retaliation" were Congress to exercise jurisdiction "very far and wide");

Brief for United States 47–48.

But, that possibility is no basis for erecting constitutional barriers here. The "field of foreign affairs" requires "delicate judgments, involving a balance that is the prerogative of the political branches to make," and these judgments are "entitled to special respect." *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 273 (2018) (plurality opinion). "Congress has the undisputed power to decide . . . whether and under what circumstances *foreign nations* should be amenable to suit in the United States." *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 493 (1983) (emphasis added). That power is not diminished simply because the United States does not recognize the sovereignty of the foreign governmental entity at issue.

Although it is possible that Congress might extend federal jurisdiction to such a degree that foreign actors retaliate, "the controlling role of the political branches" remains "both necessary and proper." *Bank Markazi* v. *Peterson*, 578 U. S. 212, 234 (2016). After all, other countries can exercise their jurisdiction in offensive ways, too. And, if they do, our political branches may decide to enact "'retaliatory' jurisdictional provisions" of their own. Born 15; accord, *e.g.*, *The Nereide*, 9 Cranch 388, 423 (1815) ("If it be the will of the government to apply to Spain any rule respecting captures which Spain is supposed to apply to us, the government will manifest that will by passing an act for the purpose").

Applying constitutional limits to Congress's authority to enact such provisions would risk impeding the political branches' efforts to conduct foreign affairs in federal litigation. That is no small matter. Civil litigation can be a bargaining chip in foreign policy. As this Court has explained, "[n]ot infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns." *Dames & Moore* v. *Regan*, 453 U. S. 654, 679

(1981) (quoting *United States* v. *Pink*, 315 U. S. 203, 225 (1942)). Following "'established international practice reflecting traditional international theory,'" nations frequently enter into agreements to settle the claims of their respective nationals. *Dames & Moore*, 453 U. S., at 679; see also, *e.g.*, *Chas. T. Main Int'l, Inc.* v. *Khuzestan Water and Power Auth.*, 651 F. 2d 800, 811 (CA1 1981) (collecting examples of the Federal Government "extinguish[ing] claims of United States nationals against foreign governments" in exchange for various concessions). Limiting the political branches' ability to extend extraterritorial jurisdiction could stymie its use of this tool for international negotiation, in turn sowing tension with the fundamental premise that foreign policy is the domain of the political branches, not the federal courts. See *Bank Markazi*, 578 U. S., at 234; cf. *Ex parte Peru*, 318 U. S. 578, 589 (1943) ("[O]ur national interest will be better served [if] cases . . . involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings").

This potential intrusion on the political branches' authority supports what the historical evidence makes clear: The Fifth Amendment's Due Process Clause imposes no limits on the Federal Government's power to extend federal jurisdiction beyond the Nation's borders. See *supra*, at 11–17.

\*    \*    \*

The Court's opinion does not foreclose the "maximalist theory of federal jurisdiction" compelled by the original understanding of the Fifth Amendment, but resolves the cases without deciding whether that understanding is correct. *Ante,* at 14. In my view, "historical evidence from the framing" provides the proper framework for deciding these cases, *McIntyre*, 514 U. S., at 370 (opinion of THOMAS, J.), and that evidence demonstrates that the Due Process

THOMAS, J., concurring in judgment

Clause of the Fifth Amendment places no territorial limitation on Congress's ability to call parties to answer.[4] And, for the reasons explained, this conclusion respects our deferential approach to the political branches' "delicate judgments" in foreign affairs. *Jesner*, 584 U. S., at 273 (plurality opinion).

Insofar as the Fifth Amendment's Due Process Clause requires deprivations of life, liberty, or property to accord with "those settled usages and modes of proceeding existing" at common law, *Murray's Lessee*, 18 How., at 277, the PSJVTA plainly meets that standard. Nothing on the statute's face or in its application here deprives respondents of an independent judge, "regular allegations, opportunity to answer, [or] a trial according to some settled course of judicial proceedings." *Id.*, at 280. And, even assuming that the law of nations might otherwise supply a rule of decision and that the PSJVTA's jurisdictional provisions are in tension with such a rule—questions on which I take no position here—those principles of international law are defeasible presumptions that Congress unmistakably overrode when it enacted the PSJVTA. In my view, the Fifth Amendment due process inquiry ends there.

---

[4] The concepts of notice and an opportunity to be heard are distinct from the Federal Government's authority to extend personal jurisdiction. Although the Fifth Amendment places no limit on the latter, it may still require that defendants be given notice and an opportunity to be heard. I do not decide that question today. Even assuming the Fifth Amendment does impose such requirements, the PLO and the PA have received due process. Both entities received notice of this suit through service of process on a representative, and the entities have not claimed that it is infeasible to defend themselves in American courts.